## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

———————————————————————

JAMES A. DUFFY,                          Case No.

     Plaintiff,                         Honorable

       vs.

ENAGON, LLC a Michigan limited           **COMPLAINT**
liability company; TERRANCE
L. EBELS, an individual;
 MARTINEAU, HACKETT,
O'NEIL & KLAUS, a Professional
Limited Liability Company; and
JEFFREY J. KLAUS, an individual

     Defendants.

———————————————————————

Timothy James O'Keefe
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, California 92801
T: (714) 520-5544
F: (714) 520-0680
E: tokeefe@catanzarite.com

Attorneys for Plaintiff

Plaintiff, James A. Duffy (Duffy or Plaintiff), a resident and domiciliary of the State of Washington, by his attorney Tim James O'Keefe for his Complaint against Defendants, Enagon, LLC (Enagon), a Michigan limited liability Company; Terrance L. Ebels, a.k.a. Terry Ebels (Ebels); Martineau, Hackett, O'Neil & Klaus, a Professional Limited Liability Company (Martineau Firm); and Jeffrey J. Klaus (Klaus), alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, James A. Duffy, also known as James Duffy and Jim Duffy ("Duffy"), is now and at all times relevant was a resident and domiciliary of the State of Washington.

2.      Defendant, Enagon, LLC ("Enagon") is a Michigan limited liability company organized May 1, 2013 bearing Identification Number: 801703263(Old ID Number: E21901) is a citizen of the State of Michigan doing business as a manufacturing company of machine tools from its Allegan County offices located at 3381 Blue Star Highway, Saugatuck, MI 49453.

3.      Defendant Terrance L. Ebels, also known as Terry Ebels ("Ebels"), is an individual, a Michigan resident residing in Holland, Michigan, and is the Manager of Enagon and its controlling owner.

4.      Defendant Martineau, Hackett, O'Neil & Klaus, is a Professional Limited Liability Company ("Martineau Firm") engaged in the practice of law, with its principal office at 555 N Main St, Mount Pleasant, Michigan, and satellite offices located at 11512 North Straits Highway Cheboygan, Michigan and 127 West 4th Street, Clare Michigan.

5.       Defendant Jeffrey J. Klaus ("Klaus") an individual, is an attorney at law admitted to practice before the Bar of the State of Michigan, is a Michigan resident, and is employed by defendant Martineau, Hackett, O'Neil & Klaus, a Michigan law firm domiciled in Michigan with its offices as stated above.

6.      Pursuant to 28 U.S.C. § 1332(a) there is complete diversity of citizenship between Plaintiff on the one hand and Enagon, Ebels, Martineau Firm and Klaus on the other hand and the amount at issue is not less than $75,000.

7.      This action also arises under Sections 10(b), 20A, and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78t-l, and 78t, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

8.      This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Enagon maintains its principal place of business in this District. Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information, occurred in this District.

10.      Venue is also proper in this Court under 28 U.S.C., § 1391 because the events giving rise to the claims occurred in this District.

## FACTS

11.      In mid-February 2020, Lee Schunk and Mike Schunk, who are not parties in this action (separately sometimes "Mike" and "Lee" and jointly referred to herein as "Schunks") telephoned Duffy at his residence in Washington state. Schunks knew Duffy from Duffy's prior passive investment loans to Amerihemp, LLC ("Amerihemp"), a Michigan limited liability company in 2019 and 2020 then engaged in hemp farming and processing.

12.      Schunks explained their purpose was to solicit Duffy for his investment in the membership interests in M-61 Processing, LLC (M61) a Michigan limited liability company formed February 21, 2020.

- 3 -

13.     Schunks told Duffy they, through M61, planned to purchase equipment, specifically three stainless steel sonic mills and related attachments, to commercially process hemp and other agricultural plant material (collectively the Equipment) that would convert biomass into a commercially useful powder for numerous applications.

14.     In the same conversation, Schunks explained to Duffy that because M61 was newly organized with insufficient startup capital to purchase the Equipment needed to execute the M61 business plan, they intended to finance the Equipment purchase with a loan from SCL1, LLC (SLC), an equipment finance company located in Denver, Colorado.

15.     Schunks further told Duffy they had arranged that SLC would meet in Michigan to determine if it would make the loan to M61 to purchase the Equipment.

16.     Schunks invited Duffy to an in-person meeting in Michigan with Enagon, the Equipment's manufacturer. They informed Duffy that Ted M. Harris (Harris), a principal officer of SLC, and Ebels, who was believed to be the sole member and manager of Enagon, would be present with Mike to explain the investment opportunity.

17.     Schunks also told Duffy in that same telephone conversation that if he attended, he'd see a demonstration of a smaller prototype version of the three sonic mills to be purchased by M61 and would hear Ebels and Mike discuss the merits of the proposed enterprise, the attractiveness of the investment, how the membership interests would be issued, how the business operations would be structured and financed and the forecast results of operations.

18.     Duffy demurred, explaining he was old, at that time age 84, retired and was not looking for new business or investment opportunities. He also told Schunks he had no discretionary capital to invest and would have to borrow funds if he were to participate. Schunks told him no cash would be required because SLC would loan M61 the funds to purchase the

Equipment from Enagon.

19.     Duffy finally agreed to go to Michigan to see the Equipment demonstrated and hear about the investment opportunity from Ebels and Mike Schunk. He traveled there on February 25, 2020 and attended three days of meetings including viewing a smaller prototype sonic mill demonstration.

20.     During the course of the three-day visit, Duffy met Ebels, Schunks and the lender SLC. Duffy also met with Klaus.

21.     During initial meetings with Mike Schunk the investment opportunity was further reviewed.

22.     On February 26, 2020 following a breakfast meeting, Duffy, Mike Schunk and Harris met at Enagon's offices and toured its operations. The visit began with a long meeting in Ebels' office, during which he extolled the merits of his patented sonic mill, that it would be a very good investment opportunity, that the Equipment was unique, how the processing equipment worked and the expected level of output from the three sonic mills that were to be purchased by M61. Ebels and Mike Schunk discussed in detail matters probing the utility and use of the Equipment, and the market for the powder output. Ebels openly and at length discussed the merits of the Equipment as an investment and the revenues to be generated by the processing output and resulting product. Ebels and Mike Schunk spoke of the expected or forecast results.

23.     Duffy alleges that in order to finance the Equipment purchase, Enagon-Ebels and M61-Schunks conspired against him to overstate the Manufacturers Suggested Retail Price ("MSRP") by creating a bogus contract and related invoice at $4,000,000. They did so in order to deceive not only Duffy as to the value of the Equipment but also SLC which had a requirement that it could not loan more than 50% of MSRP.

24.    On the basis of the falsely constructed contract and MSRP, Mike Schunk and Ebels explained that Enagon would sell the Equipment to M61 for $4,000,000 with $2,000,000 borrowed from SLC and a further $2,000,000 subordinated loan from Enagon to M61. M61 would then receive the Equipment for use in its operations to generate revenue from selling the powder product from M61's biomass processing operations creating cash flow for the $106,000 monthly payments to SLC and create a reserve to pay Enagon's principal and accrued interest on its loan within thirty-six months. Duffy had no knowledge of the scheme including the bogus $4,000,000 contract and MSRP.

25.    At that February 26, 2020 meeting, Ebels, Mike Schunk and Duffy as well as Harris of SLC saw the smaller demonstration model of the sonic mill processing equipment operated. Ebels and Mike Schunk discussed the capitalization and forecast of M61 operations, satisfactorily insofar as Duffy could determine.

26.    Enagon, Ebels and Mike mutually expressed a most favorable impression of the proposed investment, Enagon's equipment demonstration, the product output, and the forecasts Schunks had prepared.

27.    Following the demonstration, there was a much longer followup meeting in Ebels' office involving Ebels, Harris, Mike Schunk and Duffy, during which Ebels explained what the demonstration model at scale with the three larger sonic mills would produce in terms of output. SLC indicated that it would consider providing the $2,000,000 of financing based upon the $4,000,000 contract and MSRP as well as the Ebels demonstration and explanation of the output forecast. Ebels and Mike Schunk on the basis of the output numbers both opined that the revenue projections were reasonably based, such that the projected revenue would readily cover the SLC loan payments and a reasonable reserve for the subordinate loan payoff due Enagon. Ebels made

clear that the Mike forecasts for M61 were reasonably based for the Equipment he was selling at a claimed MSRP of $4,000,000.

28.     While Duffy was present for the foregoing discussions, he had no knowledge or experience regarding the area of investment or the machinery, and was incapable alone of analyzing the business plan to form an opinion as to whether the product output and forecasts were reasonable. In a word, Duffy relied on the purported expertise and opinions of Ebels and Mike.

29.     Following the last meeting of that day Harris informed Mike Schunk and Duffy that he would approve an SLC loan for $2,000,000 for the purchase of the Equipment from Enagon, for M61's use, and would require guarantees by its members but still needed to see M61's organizational documents and obtain formal approval from his SLC partners. Harris stated he fully expected that the SLC Equipment loan to fund the purchase from Enagon would be quickly approved based upon the $4,000,000 MSRP such that the M61 members needed to promptly complete the M61 company documentation.

30.     With SLC's $2,000,000 funding to M61 forthcoming, on February 27, 2020 Duffy went with Schunks to Martineau Firm's Clare, Michigan office to meet with Klaus, whom Schunks had selected to organize and represent M61 and its members. Klaus affirmed he'd been retained and was introduced to Duffy as a savvy and experienced business and transaction attorney on whom Schunks and Duffy could rely.

31.     At that meeting, Schunks briefed Klaus on the transactional terms set out in paragraphs 32 through 35 inclusive.

32.     The transaction would involve a multi-step process: first, M61 would purchase the Equipment (the three sonic mills) from Enagon as manufacturer and seller  pursuant to a contract

with a $4,000,000 purchase price which was represented to be the MSRP or an average $1,333,333 per sonic mill.

33.     Enagon would be paid the $4,000,000 MSRP by M61 as follows: $2,000,000 which it borrowed from SLC with the payment made by M61 authorization directly by SLC to Enagon and a second $2,000,000 loan from Enagon to M61 payable three years later with interest at 1% per annum.

34.     M61 would receive the Equipment from Enagon upon payment from SLC on its behalf and M61 would operate the Equipment in its leased space in order to generate revenue from which it would in turn pay its operating expenses, make the $106,000 per month payments to SLC, establish a reserve to pay the $2,000,000 payment to Enagon with interest and return a profit to the M61 members.

35.     In order for M61 to enter into the SLC $2,000,000 loan, its three members, Michael Schunk, Lee Schunk and Duffy would personally guarantee the Equipment loan.

36.     Further at the Klaus meeting, Klaus learned and other wise knew those facts described in paragraphs 37 to 39 inclusive below.

37.     Ebels and Schunks knew that of M61's three members, only Duffy was financially responsible for the $2,000,000 SLC loan and although he was 84 years of age and retired from business they knew he had a substantial property and investments portfolio.

38.     As Ebels and Klaus also well knew, Schunks, on the other hand, were modest farmers and equipment sales people with few assets, and the size and complexity of the Equipment loan transaction and the business in which M61 proposed to engage was completely outside of their experience.

39.     While Klaus listened and spoke favorably to Duffy about the Schunks as

managers and operators, he knew or reasonably should have known the proposed Equipment purchase transaction was beyond their capability, that Duffy had no knowledge regarding the bona fides of the proposed transaction and, as a resident of the State of Washington, would have no day-to-day involvement in M61's business.

40.     From the information he obtained in the meeting, Klaus necessarily realized that neither Duffy nor Schunks understood the significantly adverse, material risks associated with such a highly leveraged equipment finance transaction, and the strong potential of the members', particularly Duffy's personal guaranty being called. In fact, Klaus knew or reasonably should have known that this Equipment purchase at $4,000,000, of which 100% was financed, with the M61 loans of not more than $250,000 discussed below coming from Duffy, was in substance a 100% leveraged investment requiring payments to SLC exceeding $106,000 per month, was very high risk and not suitable for Duffy. Yet, he did not provide a warning or disclosure, and failed to caution Duffy regarding the high risk and the unsuitability of the proposed transaction.

41.     Duffy would not be working in M61's office but would instead be in Washington as a passive investor with no control, and would be entirely reliant and dependent upon the majority and controlling member the Schunks, for operational and management expertise and to generate a return for M61 and its members.

42.     While formation documents for M61 were discussed, none were reviewed because they had not yet been prepared. However, the structure was to be that Duffy would have only a 34% passive membership interest but would sign a full, 100% guaranty of the SLC finance transaction.

43.     Klaus knew that a guaranty from Schunks would be worthless as they had no assets of any substance but would rely entirely on Duffy's Guaranty and capital for the big return

from the biomass processing venture Schunks were advocating.

44.     Klaus discussed how the membership interests would be allocated, with Schunks explaining they would have a 66% ownership interest and Duffy having a minority 34% ownership interest despite his 100% guaranty to SLC being the only one of value.

45.     Objectively, Klaus either knew or would have realized that Duffy's net worth was the sole basis for SLC's participation and loan to acquire the Equipment, and that Duffy was being induced to put his capital at risk for Schunks' benefit through M61, in the obviously high-risk venture.

46.     Klaus discussed that additional documentation, including an operating agreement for M61, would be necessary and that he or another attorney from Martineau Firm would prepare the documents.

47.     Further at the meeting Schunks, Duffy and Klaus discussed initial capitalization as well as possible funding shortfalls up to $250,000 and that initial loan money of $95,000 would be required. Klaus informed Duffy he could lend money and other funds for operational requirements, and that he, Klaus, would document the loans to be repaid out of M61's income. Klaus did not, however, inform or suggest to Duffy that he should not make the loans nor acquire the membership interests and not provide the guaranty.

48.     Klaus did not indicate that there was a conflict of interest between Duffy on the one hand and Schunks on the other for at least two reasons: (1) Duffy's personal guaranty was the sole basis of the SLC loan agreement, and (2) Duffy's loans to M61 were disproportionate to his 34% interest. Klaus was required to notify Duffy in writing of these serious unwaivable conflicts.

49.     Martineau Firm and Klaus did not have Duffy sign a retainer agreement for any of

the legal work to be performed nor did it or Klaus document or even acknowledge the facially obvious conflict of interest presented by Duffy's personal guaranty of a transaction of which 66% of the benefit therefrom would inure to Schunks, the personal loans to M61 without documentation and over which they would have complete operational control.

50.     On Friday February 28, 2020, in keeping with the advice and counsel of Martineau Firm and Klaus, Duffy wired $95,000 to M61's bank account. Duffy, based upon that same advice, continued to make loans to M61 in keeping with the business plan adopted at Martineau Firm's office, as follows: $5,000 on February 27, $5,000 on March 25, 2020; $30,000 on July 6, 2020; $40,000 on August 24, 2020; $30,000 on September 3; $20,000 on September 25, 2020 and $25,000 on November 4, for total loans of $250,000 for operations. None of those loans have been repaid, M61 is out of business with a $2,200,000 judgment and is a total loss. All of the loans were made pursuant to Klaus' supervision, oversight and counsel.

51.     As Duffy understood the business arrangement after attending the meeting with Klaus on February 27, 2020:

        a.      Schunks would own 66% of M61 and Duffy would own 34%.

        b.      SLC would initially pay Enagon $2,000,000 for the M61 purchase of the Equipment with an MSRP of $4,000,000;

        c.      In consideration of such payment Enagon would promptly deliver or make available for delivery the Equipment to M61 at its place of business in Gladwin, Michigan;

        d.      SLC would have a security interest in the Equipment to secure the loan payments;

        e.      Duffy would lend to M61, as above stated at paragraph 50, all to be repaid according to documentation Klaus was to prepare;

       f.     M61 was forecast to profitably operate the Equipment from processing hemp and possibly other agricultural materials into a marketable powder; and that

       g.     from operating income M61 would pay its operating expenses, make the monthly loan payments of $106,000 to SLC, would repay Duffy's loans, and would create a reserve fund with which to timely pay in 36 months M61's second subordinated $2,000,000 promissory note due to Enagon for the balance of the $4,000,000 Equipment purchase price, its MSRP.

52.     Martineau Firm and Klaus, representing M61 and its members, sent the organization documents by email attachment to Duffy in Washington, to be signed and returned. Duffy's signature documents were sent to Washington where he printed them out and signed them without any changes and returned them, thereby becoming a minority member of M61 with a 34% interest.

53.     On March 25, 2020 knowing the M61 documentation had been completed SLC informed Klaus that SLC also required a sublease of the building where the Equipment would be installed. Klaus complied and made the sublease arrangements, thereby setting the stage for the signing of the Equipment loan and related Duffy Guaranty. That same day Duffy wired $5,000 to M61 for the building lease payment.

54.     Martineau Firm and Klaus failed to inform and advise Duffy he should obtain independent counsel, and specifically failed to inform him there existed a real and active conflict of interest between him and Schunks, knowing that Duffy's credit and Guaranty were the sole basis on which SLC would rely to finance the transaction with Enagon, that Duffy as a passive investor had no control over M61 and if the operations were unable to generate funds to pay the SLC loan and operating expenses he would be called upon to repay millions of indebtedness

pursuant to his guaranty.

55.    As Klaus prepared the sublease documents to facilitate the Equipment loan, on or about March 25, 2020 SLC sent out the transaction documents for the M61 purchase of the three sonic mills for industrial hemp processing, the Equipment, from Enagon, the Equipment finance agreement and the Equipment Financing Guaranty of Duffy.

56.    **Ebels and Schunks had actual knowledge the Equipment M61 purchased from Enagon for or an unrestricted $2,000,000 payment on March 31, 2020 in fact did not then exist- its manufacture would take not less than four and as many as six months**. They and each of them knew Duffy was unaware of this material fact. In short, Duffy was fraudulently induced to guarantee a loan for Equipment that did not exist, although the transaction documentation described it as if it did exist as the subject of the Equipment loan.

57.    Duffy alleges that Ebels, Enagon and Schunks knew the Equipment was not worth the $4,000,000 invoiced by Enagon to M61 but did so to create the fictional MSRP in order to meet the 50% of MSRP SLC loan limit. Instead, Duffy alleges upon information and belief that the Equipment was not likely worth more than the $2,000,000 paid less the kickbacks Ebels paid to Schunks estimated at approximately $400,000, yet fraudulently described in transaction documentation as Equipment purchased at MSRP for $4,000,000 as the Collateral in the SLC loan documents.

58.    On further information and belief Ebels of Enagon and Schunks were engaged in a secret partnership regarding the Equipment wherein Ebels and Enagon agreed to make payments on the SLC $106,000 per month loan payment until the Equipment was actually delivered. This Enagon reasoned would, once the Equipment was delivered and operational, demonstrate the bona fides of the sonic mill application and result in more such sonic mill sales for Enagon.

59.     Instead of manufacturing the Equipment for timely delivery on or before March 31, Enagon used the funds to pay off other vendors and creditors, and Ebels bought himself a new BMW for more than $100,000, of which he took delivery months before the January delivery of the Equipment to M61.

60.     Duffy, on information and belief, alleges that Martineau Firm and Klaus knew the Equipment did not exist on March 31, 2020 and they further knew Duffy did not know that truth.

61.     Alternatively, Martineau Firm and Klaus failed to assure the delivery of the Equipment before the $2,000,000 SLC payment to Enagon would be paid on behalf of M61, materially raising the risk of default because if M61 and Schunks had none of the three sonic mills they would be unable to produce any income and a default on the SLC obligation would immediately result.

62.     Duffy's clear and unambiguous understanding and belief at all times during discussions from February 26, 2020 and afterward was that the Equipment (the three sonic mills) had an MSRP of $4,000,000, would be manufactured and ready for delivery to M61 before the $2,000,000 payment was made, as M61's use of the Equipment was the essential precedent condition to success. Notwithstanding Duffy's understanding and belief, Enagon, Ebels and Schunks knew the Equipment did not have a realistic MSRP of $4,000,000, did not then exist and that it would not be timely and contemporaneously delivered to M61.

63.     Further, Duffy alleges on information and belief that Klaus also knew the Equipment did not exist at the time the $2,000,000 payment would be made by SLC to Enagon, but failed to so inform Duffy.

64.     The transaction documentation for M61, for which Duffy provided his guaranty, placed the Equipment at M61's Michigan address, thus indicating that the Equipment had been

or was promptly to be delivered as the documentation provided before or contemporaneously the $2,000,000 payment. Duffy at that time believed the Equipment would be promptly delivered upon payment and that M61 was preparing to begin processing hemp biomass.

65.     Ebels, Enagon, Schunks and M61 intended by this gambit to provide funding to manufacture the Equipment in order to fund a broader anticipated venture between at the least Ebels and Schunks in hemp biomass production which would be funded through Duffy's Guaranty, who they all assumed would make payments until the Equipment was actually delivered and operational, but concealed that intention from Duffy.

66.     In September 2020, Duffy was served with the summons and complaint in that certain action styled *SLC1, LLC vs. M-61 Processing, LLC, Michael Schunk, James Duffy, Amerihemp Michigan, LLC, And Schunk's Rock Farm, LLC*, as Case No. 2020CV033087, filed on September 8, 2020 in the District Court of Colorado, City and County of Denver (the "Colorado Action").

67.     The Colorado Action involving Duffy was set for trial in January 2022, meanwhile all the other defendants were promptly defaulted and owe in excess of $2,200,000.

68.     After the Colorado Action was filed, Martineau Firm and Klaus were informed of the complaint and undertook to represent all of the defendants, again without obtaining and or discussing a conflict waiver and without an engagement letter, and negotiated with counsel for SLC in Colorado to work out deferral of the payment default, with payment terms of $50,000 per month for three months commencing September 28, 2020.

69.     At that same time Klaus wrote Enagon and Ebels and communicated with their lawyer when he confirmed that, notwithstanding the SLC payment of $2,000,000 on March 31, 2020, none of the Equipment had been delivered as of the September 8, 2020 filing of the

complaint. Klaus then wrote Enagon and Ebels that prompt delivery of the Equipment was required, but Enagon and Ebels disputed that delivery was even due before October 23, 2020, that Mike had signed a purchase agreement which allowed Enagon six months to manufacture the Equipment. Thus, during those written exchanges and related negotiations Klaus learned that the Equipment was not even scheduled to be delivered until October 23, 2020.

70. Martineau Firm and Klaus took no action to cancel the Equipment purchase, nor to hold up delivery of the Equipment to protect the value, but instead just recommended to Duffy that he make the three $50,000 payments. Duffy agreed only to make the first two payments of $50,000 which he did so by wire transfer on September 30, 2020 and October 26, 2020.

71. In fact Martineau Firm and Klaus, despite knowing that Duffy's second $50,000 payment was due October 26, three days after the October 23, 2020 Equipment Enagon disclosed delivery date, took no action to advise Duffy not to make the second payment when Enagon failed to deliver the Equipment.

72. During the September 2020 phone calls with Schunks and Klaus, Duffy learned for the first time that the Equipment had never been delivered. He and Klaus were also informed at that time by Mike Schunk that Enagon was to make the payments on the loan until the Equipment was delivered but reneged. Klaus did not recommend that Duffy immediately secure independent legal counsel, but instead encouraged and recommended that Duffy make all of the $50,000 payments as to which he agreed only to make two of the three stipulated payments.

//

//

//

//

73.     Additionally, in September 2020, Michael and Lee Schunk for the first time gave Duffy a copy of a June 26, 2020 email from Harris addressed to Ebels of Enagon and Mike Schunk stating:

(1) When we wired the money to Enagon we were told an existing mill was to be deployed to M61 so Mike could get up and running and start making money. We never pre-fund manufacturers until the equipment is ready to be shipped. We need to schedule a site inspection as I have informed everyone many times.

(2) I was told when I was at Enagon that the mill I saw the demonstration on was going to be delivered and deployed on a temporary basis until the final mill was deployed to (sic) Enagon and that would happen in 4 months. This has not happened. This is a real issue that needs to be resolved immediately.

(3) We can not (sic) have accounts go 30 days past due because they get passed to our asset manager and our in house legal department.

(4) This is about to be out of my hands and when it goes to my legal department then we are in a place we do not want to be.

74.     Upon reading the June 26, 2020 email, Duffy confronted Schunks and Klaus, telling them that Enagon, Ebels and Schunks at the outset knew they were paying $2,000,000 for equipment that did not exist. Despite this, Martineau Firm and Klaus took no action to protect

Duffy.

75.     When it came time for the third of the three payments on November 26, 2020, this one by Schunks, they defaulted and Enagon once again refused to make the payment. Moreover, at that time Enagon still had not delivered the Equipment to M61 which recall was promised as of the latest October 23, 2020.

76.     Ultimately, M-61 Processing, LLC, Michael Schunk, Amerihemp Michigan, LLC, and Schunk's Rock Farm, LLC, defendants in the Colorado Action, failed to answer and effective December 2020 SLC took default judgments against each of them for more than $2,000,000 each, domesticated the judgments in Michigan and levied on all of those defendants' assets, including the Equipment.

77.     Importantly, as of December 14, 2020 none of the Equipment had yet been delivered by Enagon to M61. Upon information and belief the Equipment was not delivered until January 2021 when delivered to M61 and the Schunks against whom SLC already had a $2,200,000 judgment. The Equipment was therefore delivered approximately ten months after the March 31, 2020 payment of $2,000,000 to Enagon.

78.     The Equipment was repossessed by SLC in July 2021 six months after its delivery to M61. The Equipment sustained serious damage in the hands of the Schunks and sold for $400,000. Recall that the alleged Equipment MSRP was $4,000,000 when completed. Upon information and belief the Equipment had a true MSRP of not more than $400,000 per sonic mill or $1,200,000 total not $4,000,000 and not even the $2,000,000 paid.

79.     Duffy answered, cross claimed and counter claimed in the Colorado Action against M61 and Michael both of whom failed to answer and against whom Duffy has a default.

80.     As above alleged, Duffy executed and delivered his personal guaranty of the SLC

to M61 Equipment Financing transaction on his understanding and belief that the Equipment would be delivered to M61 upon SLC's $2,000,000 payment to Enagon, thus permitting M61 to get it operational and begin to generate the revenue required  pay SLC, repay the loans from Duffy and create a reserve for the $2,000,000 purportedly due to Enagon.

81.    Enagon had no ability and no intention to deliver the Equipment to M61 upon receipt of the $2,000,000 on March 31, 2020, as and when promised.

82.    Enagon, falsely or negligently, misrepresented to Duffy among other things described above the MSRP and that it would deliver the Equipment to M61 promptly upon receipt of SLC's payment to Enagon.

83.    Enagon and Ebels knew of the falsity of such Duffy representations.

84.    Duffy reasonably relied to his detriment upon the foregoing representations.

85.    Enagon knew or should reasonably have known it was critically important to Duffy that the Equipment be at a realistic MSRP and that Enagon's delivery of the Equipment to M61 would occur contemporaneously with SCL's payment and its failure to inform Duffy of the truth of the MSRP and that contemporaneous delivery would not occur, was an intentional misrepresentation and omission of material facts.

86.    Duffy reasonably believed, when his personal guaranty was solicited as above alleged, that the Equipment was on site or would be on site at M61 with SLC's $2,000,000 payment to Enagon for the Equipment with an MSRP of $4,000,000.

87.    On such reliance, Duffy became an M61 member, provided loan funding as above alleged, and delivered his Equipment Loan guaranty for performance of the SLC Equipment Financing Agreement.

88.    Duffy subsequently learned the Equipment was not delivered to M61 until some

in January 2021 at the earliest.

89.    Duffy has also learned that SLC seized the Equipment from M61 in July and now due to the misrepresentation of the MSRP and extensive damage it sold for $400,000.

90.    Duffy also learned that SLC executed on the Amerihemp inventory and equipment the accounting and disposition of which is unknown. Duffy loaned $709,250 to Amerihemp and Schunk Rock Farm LLC which now appears to be a total loss.

91.    Duffy as a result of his guaranty of the M61 loan Guaranty, after extensive litigation settled his obligation on the Guaranty with SLC for $1,250,000.

92.    As a result of the foregoing, Duffy has suffered loss, injury and damage according to proof at trial.

## COUNT I

### Primary Violation of Washington State Securities

### Act, Chapter 21.20 RCW, Against Enagon,

### Ebels, Martineau Firm and Klaus

93.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

94.    Defendants Enagon, Ebels, Martineau Firm and Klaus were sellers of securities to Duffy under the Washington State Securities Act (WSSA) because they substantially contributed to the sale to Duffy of the M61 membership interests, which included the obligation to provide loans and to guarantee to SLC the $2,000,000 loan financing of M61 for the three sonic mills hemp biomass processing Equipment.

95.     Enagon, Ebels, Martineau Firm and Klaus were among the members of the Control Group identified herein.

- 20 -

96.     Enagon and Ebels made material misrepresentations in the sale of securities by representing to Duffy that the Equipment was viable for M61's contemplated use, had an MSRP of $4,000,000 and they would deliver the Equipment to M61 on or before, or contemporaneously with the $2,000,000 payment by SLC, in violation of Revised Code of Washington, RCW § 21.20.010.

97.     Martineau Firm and Klaus made material misrepresentations in the sale of securities by representing to Duffy they would form M61 for the members in an appropriate legal structure such that Duffy's loans of $250,000 and his guaranty of the SLC Equipment loan obligation of M61 would be structured such that, at minimum, Enagon would deliver economically viable processing Equipment to M61 with an MSRP of $4,000,000 before the $2,000,000 payment by SLC, in violation of Revised Code of Washington (RCW),§ 21.20.010.

98.     Enagon, Ebels, Martineau Firm and Klaus further violated Washington RCW 21.20.010 by omitting material facts in the sale of securities, including as described at paragraphs 99 through 111 inclusive.

99.     Enagon, organized only on May 1, 2013 had never successfully developed or constructed, or manufactured machinery of the nature and quality of the contemplated Equipment.

100.     Enagon had sales of under $2,000,000 per year in its limited history and only 5-7 employees with limited credit available to it, believed to be trade credit of not more than $100,000 from any one vendor.

101.     The February 26, 2020 presentation meeting at Enagon touted non-existent unproven Equipment that had not been commercially vetted and would produce output that had unproven saleably.

102.    The $4,000,000 MSRP and contract between Enagon and M61 was fraudulently contrived in order to circumvent the SLC limitation of 50% of Manufacturers Suggested Retail Price in order to obtain the $2,000,000 loan.

103.    Enagon would not deliver the Equipment to M61 contemporaneously with receipt of the $2,000,000 payment from SLC.

104.    Notwithstanding its limited history, lack of experience and limited trade credit Enagon would not be required to escrow the $2,000,000 SLC payment funds for purposes of developing and manufacturing the then non-existent Equipment but would take the money into its general account without restriction.

105.    Mike Schunk authorized the payment by SLC of $2,000,000 to Enagon without confirming shipment and delivery of the Equipment to M61 and without escrowing the funds because he had a secret partnership and kickback arrangement with Enagon and Ebels.

106.    Enagon would not deliver the Equipment until the earliest October 23, 2020 more than six months after receiving the $2,000,000 whereas M61 had no assets and no operations and as such would have to rely upon Duffy to fund the $106,000 plus payments per month- this of course could not be disclosed to Duffy because he would refuse to make such an investment, sign the Guaranty and make the loans.

107.    Enagon and Ebels, notwithstanding Ebels' favorably expressed opinions regarding the Equipment and its utility to M61's business plan, did not believe those statements were true and instead it/he/they made them solely to secure Duffy's commitment to acquire the 34% M61membership interest investment, to provide loans and to guaranty the non-existent Equipment SLC loan so that Ebels and Enagon could obtain the $2,000,000 from SLC.

108.    The failure to deliver the Equipment with SLC's $2,000,000 payment to Enagon

would cause the loan to default, would trigger demand on Duffy's guaranty, and would cause Duffy to lose the anticipated financial benefit of his 34% membership interest in M61, his loans, and his participation in the hemp processing business M61 planned and intended..

109.     The M61 operating agreement did not protect Duffy who was an absent passive purchaser of securities from Washington from the Ebels-Enagon and Schunks' lack of sufficient business expertise and dishonest conduct thereby jeopardizing his loans as well as his membership interests and exposed him to liability on the guaranty.

110.     No disclosures were made that Schunks had a bad business reputation and no credible experience in operations as were anticipated to be required, nor were they considered trustworthy.

111.     Ebels and Mike Schunk's knowingly false representation that the Equipment existed with an MSRP of $4,000,000 and its use as Collateral when in fact both knew that the same was false and a cover up to get SLC to fund the $2,000,000.

112.     Duffy reasonably relied on these material misrepresentations and omissions when he signed the M61 operating agreement and committed to the M61 34% membership interest purchase, the loans and the signing of the guaranty all of which were consummated in Washington.

113.     Duffy signed transaction documents, including the M61 operating agreement sent to his residence in Washington, provided the loans and the guaranty, because he believed M61 would profitably operate its proposed hemp processing business with a resulting financially viable and stable investment which would be more than able, based upon discussions by Ebels and Mike at the February 26, 2020 meeting to meet the Equipment loan obligation, the final $2,000,000 obligation to Enagon, and would provide long-term growth of earnings and profits

from the intended business opportunity.

114.    Duffy reasonably relied on Enagon, Ebels, Martineau Firm and Klaus' false representations and invested in M61 acquiring the 34% membership interest, providing loans and personally guaranteed the SLC obligation.

115.    In addition to the primary violations set forth above, Enagon, Ebels, Martineau Firm and Klaus falsely represented themselves as persons with substantial industry experience, and expressed opinions and made representations not reasonably based on fact, and therefore each and all of said defendants violated Washington RCW 21.20.010. Therefore, defendants' primary violation of the statute also serves as basis for secondary liability as set forth below.

116.    Plaintiff is entitled to damages in an amount to be proven at trial, plus prejudgment interest of eight percent per annum, costs, and attorneys' fees, pursuant to Washington RCW 21.20.430(1).

## COUNT II

### Control Person Liability under WSSA

### Against Enagon, Ebels, Martineau Firm and Klaus

117.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

118.    Enagon, Ebels, Martineau Firm and Klaus were at all times relevant officers, directors, agents, and/or control persons regarding the $2,000,000 payment from SLC to Enagon, which was for the direct benefit of M61 and for the benefit of Duffy as its 34% membership interest purchaser and M61's guarantor, and said defendants were thereby subject to the requirement of RCW 21.20.430(3) to timely deliver or see to the delivery of the Equipment to M61 with a legitimate MSRP of $4,000,000 in coordination with SLC's $2,000,000 payment to

Enagon.

119.    Said defendants were at all times relevant also officers, directors, agents and/or

control persons concerning SLC's purported $2,000,000 payment to Enagon for the direct benefit

of Duffy pursuant to RCW 21.20.430 (3), because they had authority to control the receipt of the

$2,000,000 payment and in particular to assure delivery of the Equipment before or concurrent

with payment to Enagon.

120.    By reason of such status Enagon, Ebels, Martineau Firm and Klaus are jointly and

severally liable for primary violation of RCW §21.20.430(1) and (3) by M61 and Schunks as set

forth above.

**COUNT III**

**Violation of Section 10(b) of the Securities Exchange Act of 1934**

**(15 U.S.C. § 78a et seq.)("Exchange Act") and Rule 10b-5**

**Against Enagon, Ebels, Martineau Firm and Klaus**

121.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth

herein.

122.    In violation of Section 10(b) and Rule 10b-5, Defendants Enagon and Ebels

falsely represented to Duffy, regarding his M61 membership interest investment, which required

Duffy's personal guaranty of the Equipment purchase obligation, that Enagon would sell the

processing Equipment with a legitimate $4,000,000 MSRP to M61 for an initial payment of

$2,000,000 borrowed from SLC and a deferred $2,000,000 three year note due to Enagon, would

deliver the Equipment to M61's premises upon the SLC payment of $2,000,000.

123.    In violation of Section 10(b) and Rule 10b-5, Defendants Martineau Firm and

Klaus falsely represented to Duffy regarding his M61 membership interest investment, which

- 25 -

required Duffy's loans and personal guaranty of the SLC Equipment Finance agreement, that Schunks' majority control of M61 was reasonably based knowing that SLC would not fund the $2,000,000 otherwise and with knowledge that Schunks had a bad business reputation, were untrustworthy and without any credible financial or operating experience.

124.    Further, Martineau Firm and Klaus failed to investigate Enagon and Ebels given the relative small size of the company, the $4,000,000 MSRP and to disclose the same to Duffy.

125.    Said defendants further violated Section 10(b) and Rule 10b-5 by omitting material facts in the sale of said securities, including without limitation as described above and at paragraphs 98 through 111 inclusive.

126.    The misrepresentations and omissions of these defendants were made in their respective roles as persons who ostensibly possessed substantial industry experience and expertise, as well as knowledge of Enagon's relatively small size and lack of substance, and the Schunks' business practices and reputation, and lack of credible financial and operating experience, whose opinions were as a matter of law required to be reasonably based in fact.

127.    There was no such basis for defendants' opinions. As such, each and all such opinions violated § 10(a) of the Exchange Act and Rule 10b-5.

128.    Further, defendants' primary violation may serve as the basis for secondary liability as set forth below.

129.    Defendants Enagon, Ebels, Martineau Firm and Klaus knew such representations and omissions described above were false and misleading when they were made, or they acted with reckless disregard of the truth regarding such matters.

130.    Said defendants' scienter is evidenced by Enagon and Ebel's joining with Mike Schunk in falsifying the representation that the Equipment had a legitimate MSRP of $4,000,000

and that the Equipment was or would be manufactured and subject to delivery as described in the definition of "Collateral" in the SLC loan documents knowing that the Equipment had not even been built, was not under construction at that time and once assembly/construction started six months would be required for delivery.

131.    Enagon and Ebels had actual knowledge the $2,000,000 was received on the false representation the Collateral/Equipment, had a legitimate MSRP of $4,000,000 and did not then exist which it shared with Schunks but not Duffy.

132.    Klaus did not inform Duffy of the conflict given the obvious misuse of his credit through the guaranty and loans, knowing that Schunks bad if not fraudulent business practices and the small relative size of Enagon could well lead to loss, injury and damage to Duffy.

133.    Klaus did not direct Duffy that based upon what he knew about Schunks he had an unwaivable conflict of interest and had he warned Duffy and referred him out to independent un-conflicted counsel, Duffy would not have purchased the M61 membership interest, made the loans nor signed the SLC guaranty.

134.    Enagon's wrongful refusal to make the payments under the SLC Equipment loan despite Ebel's statements to Mike Schunk knowing the Equipment had not been shipped to M61 and that Duffy had no knowledge of same.

135.    Klaus' refusal to disclose the Schunks business reputation while giving them control over Duffy's investment in M61 which led to the misrepresentation that the Equipment had been delivered when in fact that was deliberately false providing cover to Schunks, Enagon and Ebels to use Duffy's credit in order to secure the $2,000,000 payment.

136.    Enagon, Ebels, Martineau Firm and Klaus' deceit and collusion in this respect was a blatant violation of the Exchange Act and Rule 10b-5.

137.    Duffy relied in good faith on Enagon, Ebels, Martineau Firm and Klaus' deceitful representations as he considered the proposed investment, reasonably believing his SLC guaranty would not be called because the purported reasonably based income projections from the biomass processing Equipment were represented to be favorable, that the Equipment had a legitimate MSRP of $4,000,000, existed and would be delivered at the time of $2,000,000 payment on March 31, 2020, and thereafter Schunks were skilled managers who could successfully operate the same.

138.    Notwithstanding the Ebels agreement with Schunks to make the SLC loan payments, Enagon and Ebels never intended to make all the payments for the tardy delivery of the Equipment because they either already knew the Equipment had not been delivered or they had no intention of doing so because they intended from the outset to rely on Duffy's guaranty in order to take their time to build the Equipment while relying upon Duffy to make the payments.

139.    Enagon, Ebels, Martineau Firm and Klaus knew the falsity of the foregoing statements or acted with reckless disregard to their falsity.

140.    Duffy reasonably relied on these misrepresentations in both acquiring the M61 membership interest securities, agreeing to provide his personal guaranty of the M61 Equipment Financing Agreement and making the $250,000 in loans. If Duffy had known the MSRP of $4,000,000 was not legitimate or there had been no intention or plan to promptly deliver the Equipment, he would have declined the offer to invest in the M61 membership interests, would not have signed the Guaranty and would not have made the loans.

//

//

//

**COUNT IV**

**Violation of Section 20(a) of the Exchange Act (15 U.S.C. § 78t)**

**Against Enagon, Ebels, Martineau Firm and Klaus**

141.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

142.    Defendants Enagon, Ebels, Martineau Firm and Klaus were control persons as to M61 in that without Enagon's agreement to sell and deliver the processing Equipment as above described, it was impossible for M61 to assume the role of a going concern and it would necessarily default on the SLC Equipment Financing agreement and fail.

143.    These defendants knew all this and knew they had the power of complete control over M61, and did exercise and assert such control as it suited their plans.

144.    One such instance was their decision to waive the initial material requirement that Enagon deliver Equipment with a legitimate MSRP of $4,000,000 and that the Equipment be delivered to M61 upon receipt of the March 31, 2020 payment of the $2,000,000 from the SLC loan. A third is the requirement that the relatively small and new Enagon escrow the $2,000,000 funding so that draws would only be made based upon progress.

145.    These defendants had the power to exercise control and did exercise control of M61 as it suited their purposes. Such control manifested itself in instances as related above.

146.    By virtue of their status as control persons, these defendants are jointly and severally liable to Duffy for all damages related to said defendants' primary violations of Section 10(b) and Rule 10b-5 set forth above.

//

//

**COUNT V**

**Violation of the Washington Consumer Protection Act**

**Against Enagon, Ebels, Martineau Firm and Klaus**

147.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

148.    The actions of Enagon, Ebels, Martineau Firm and Klaus in their solicitation and facilitation of Duffy's M61 membership interest investment coupled with the requirement of his personal guaranty of the biomass processing Equipment, his loans and such parties' failure to disclose the material and operative facts that (a) the $4,000,000 MSRP was not legitimate, (b) Enagon would have six months to deliver the Equipment to M61 following receipt of SLC's $2,000,000 payment, but that ( c) there would be no loan payment grace period pending delivery of the Equipment such that (d) notwithstanding such delay in delivery of the Equipment, the borrower's obligation to pay monthly loan payments of $106,000 would commence upon Enagon's receipt of SLC's $2,000,000 payment, and (e) that the practical effect of such arrangement would be SLC's call on Duffy to honor his guaranty, thereby effectively nullifying the assurances and other representations, as above alleged, the control group made to Duffy during the February 26 through 28th 2020 meetings, inspection and demonstration of the Enagon processing sonic mill that Duffy attended.

149.    The foregoing, Duffy alleges, constituted deceptive and/or unfair acts or practices of the control group persons and entities, defendants herein, in the conduct of a trade or commerce, all of which were violations of RCW 19.86.020.

150.    As advisors to and aiders and abettors of one another Enagon, Ebels, Martineau Firm and Klaus all participated in or knowingly approved such conduct of one another and

consistent with established authority are each and all jointly and severally subject to personal liability for the loss, injury and damages Duffy has incurred. *Grayson v. Nordic Const. Co., Inc*., 92 Wn.2d 548, 554, 599 P.2d 1271 (1979).

151.    Further, this action affects the public interest because Enagon, Ebels, Martineau Firm and Klaus have, on information and belief, caused loss, injury, damage and harm to other persons and/or entities in the same manner as they have Duffy. *Bavand v. OneWest Bank*, 196 Wn.App. 813, 385 P.3d 233 (2016). Duffy so alleges because, on information and belief, the control group persons and entities actively proffered the same or similar investment structure to others that they used to deceive Duffy.

152.    The unfair and deceptive acts and practices of these defendants proximately caused Duffy to suffer loss, injury and damage of not less than $2,000,000 plus costs and attorney fees.

153.    Further, pursuant to RCW § 19.86.090, Duffy is entitled recover damages in an amount to be proven at trial, plus treble damages up to $25,000.

**COUNT VI**

**Negligent Misrepresentation**

**Against Enagon, Ebels, Martineau Firm and Klaus**

154.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

155.    Enagon, Ebels, Martineau Firm and Klaus and each of them, falsely informed Duffy and omitted material information, leading Duffy to understand and believe that the MSRP of the Equipment was a legitimate $4,000,000 and that when SLC paid Enagon the initial $2,000,000, Enagon would promptly deliver the bio-mass processing Equipment to M61 and that

M61would promptly commence its biomass processing business, operated by reasonably competent and trustworthy managers the Schunks, such that the three sonic mills would generate cash flow sufficient to make monthly loan payments to SLC, repay the loans and earn a return for investors.

156.    Duffy reasonably relied on Enagon, Ebels, Martineau Firm and Klaus' representations, and was unaware of and unable to know of Enagon, Ebels, Martineau Firm and Klaus' material omission regarding the legitimate MSRP of the Equipment and M61's Equipment delivery date, the false statements about forecast operations, and that Schunks were incapable of managing the business and were untrustworthy, that Enagon was a relatively small company with no experience at the contemplated Equipment level and these false representations and material omissions proximately caused Duffy to agree to purchase 34% of the membership interests in M61, to sign the SLC guaranty as above alleged, to imprudently provide a personal guaranty to SLC that M61 would timely pay the processing Equipment loan payments and to provide the loans.

157.    Defendants knew or are charged with knowledge that Duffy relied on them and each of them to give him true and complete information regarding the legitimacy of the MSRP and suitability of his M61 investment, his guaranty of payments regarding M61's Equipment purchase from Enagon with the SCL financing and the loans.

158.    As the direct and proximate result of the misrepresentations and material omissions alleged above, Duffy has suffered loss, injury and damage in an amount to be proven at trial.

//

//

**COUNT VII**

**Intentional Misrepresentation (Inducement Fraud)**

**Against Enagon, Ebels, Martineau Firm and Klaus**

159.     Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

160.     As above alleged, Enagon, Ebels, Martineau Firm and Klaus materially misrepresented facts related to, and concealed from Duffy material facts regarding, the Equipment MSRP of $4,000,000, the effect of Duffy's personal guaranty vis-a-vis the delivery date of the bio-mass Equipment to M61 as related to the commencement of monthly loan payments, the false statements about forecast operations, that Enagon was of relatively small size for the contemplated purchase, that Schunks were incapable of managing the business and were untrustworthy, and the effect of all such factors on Duffy's liability on the personal guaranty to SLC.

161.     Duffy reasonably relied on such representations, and other related misrepresentations and material omissions as alleged above.

162.     As the direct and proximate result of Duffy's reliance upon such representations and material omissions, Duffy has suffered loss, injury and damage in an amount to be proven at trial.

163.     In doing the acts alleged, defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive and exemplary damages in amount to be determined according to proof at the time of trial.

//

//

**COUNT VIII**

**Promissory Fraud**

**Against Enagon and Ebels**

164.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

165.    The false representations of Enagon and Ebels were that:

a.    The three sonic mills, the Equipment, had a legitimate MSRP of $4,000,000;

b.    The sonic mills were based upon a patent held by Enagon;

c.     The bio-mass Equipment would actually be suitable for the hemp market as demonstrated in the February 26, 2020 meeting described above;

d.    The Equipment would efficiently and appropriately produce a product as hemp powder that would be commercially viable;

e.    Enagon's sale of the bio-mass Equipment to M61 was congruent with its $2,000,000 payment on March 31, 2020, or

f.    Enagon's decision to intentionally omit such facts in discussions with Duffy, and

g.    Enagon's failure to inform Duffy there could be a six-month gap between the SLC $2,000,000 payment date and delivery of the Equipment to M61, and that the absence of any such congruence would not excuse Duffy's obligation under his guaranty to SLC to hold it harmless from M61's inability to operate and be unable to pay the loan payment because Enagon had not delivered the bio-mass Equipment that was central to M61's business plan.

166.    And the timing of the M61 business plan vis-a-vis the obligation Enagon, and

Ebels urged Duffy to incur was the crucial element in Duffy's decision regarding his purchase of 34% of the membership interests of M61, the SLC guaranty and the loans.

167.    Duffy reasonably relied on such representations, and other related misrepresentations and material omissions as alleged above.

168.    Enagon and Ebels intended that Duffy rely on such misrepresentations omissions and intended to misinform him regarding the MSRP and the immediate liability they were urging him to incur by acquiring the M61 membership interests which required the signing and delivery of his personal guaranty of the $2,000,000 SLC loan.

169.    As alleged, Duffy did, as alleged, rely and act to his detriment on such misrepresentations and the omission of material information.

170.    In so doing, Duffy suffered loss, injury and damage according to proof at trial.

171.    In doing the acts alleged, defendant acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive and exemplary damages in an amount to be determined according to proof at the time of trial.

## COUNT IX

## Legal Malpractice

### Against Martineau Firm and Klaus

172.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

173.    Plaintiff brings this claim against Martineau Firm and Klaus.

174.    Duffy and Martineau Firm and Klaus entered into an oral attorney-client agreement wherein Martineau Firm and Klaus undertook to provide the legal serves for Duffy as described herein.

- 35 -

175.    Martineau Firm and Klaus never tendered a written engagement agreement for Duffy to execute nor did they disclose to Duffy the numerous conflicts of interest that were present, including those that were unwaivable.

176.    At all times relevant hereto, Martineau Firm and Klaus touted themselves to Duffy as competent attorneys with substantial expertise in forming business entities, including limited liability companies, Equipment loan finance transactions, that they were versed in hemp and cannabis opportunities, and that they organized M61 without informing Duffy of the risk to him as a minority member who had guaranteed 100% of a highly leveraged loan transaction with no management position, and that he would be at Schunks' mercy as a passive investor with no management control.

177.    Martineau Firm and Klaus owed Duffy a duty of care and loyalty, to represent him in accordance with relevant legal and ethical standards of care within the practice of law.

178.    Martineau Firm and Klaus were particularly suited to objectively advise Duffy on the contemplated M61 investment because of their long standing relationship in the Clare Michigan business and farming community as well as in Clare and Isabella counties in central Michigan. Clare itself has a population of less than 3,100 persons and is a farming community. In the course of their work in the community these attorneys were aware of Schunks' insignificant farming and equipment sales activities as well as their poor business reputation and untrustworthiness.

179.    Not later than August 2020 Klaus was informed by Schunks that the Equipment had not yet been delivered, that SLC demanded $106,000 per month payments which were in default and that Enagon which through Ebels had promised to make the payments until the Equipment had been delivered had reneged and refused to pay.

180.    In September 2020 Klaus on behalf of M61 and its members became aware of collection efforts by M61 and was in communication with Brad Magill of the Colorado Collection Law Group counsel for SLC regarding non-payment of the SLC loan payments.

181.    Klaus knew the Equipment had not been delivered at the time of the $2,000,000 payment and that Enagon's position was that it did not need to deliver the Equipment until October 23, 2020.

182.    Without evaluating M61 and Duffy's options, including against Enagon which had promised to pay until Equipment delivery, and objectively advising all of its members of the precarious position M61 and the guarantors were in, Martineau Firm proffered payment terms of three payments of $50,000 on September 30, 2020, October 27, 2020 and November 27, 2020. Once again, Klaus and Martineau Firm did not advise Duffy to seek independent legal counsel.

183.    Instead of advising M61 and Duffy to take immediate action against Enagon and Ebels, Klaus and Martineau Firm with knowledge that Duffy was paying the first two $50,000 payments simply engaged in a phone and email exchange with SLC counsel deferring the massive problem.

184.    In fact in discussions between Klaus, Duffy and the Schunks, Duffy made clear to Klaus he was making only two of the three payments for a total of $100,000 and no more because he had already provided $250,000 of loans, that he had informed all that he had to borrow such funds against his residence and did so on a personal line of credit.

185.    In fact Klaus had been informed in the February 27 meeting with Duffy at his Clare office that such residence loans would be the source of his M61 loans.

186.    On September 30, 2020 Duffy made the first $50,000 payment to SLC on the Klaus negotiated forbearance.

187.    On October 23, 2020 Enagon failed to deliver the Equipment to M61.

188.    Klaus and Martineau Firm failed to advise Duffy that Enagon had failed to deliver the Equipment on or before October 23, 2020 and that he should contact independent legal counsel.

189.    On October 26, 2020 Duffy made the second $50,000 payment to SLC on the Klaus negotiated forbearance without knowledge the Equipment still had not been delivered.

190.    Nonetheless Ebels managed to take delivery on October 28, 2020 of a new 2020 BMW X5 with an estimated purchase price in excess of $100,000.

191.    On  November 27, 2020 the third $50,000 payment was due but consistent with any objective understanding of the Schunks credibility, they failed to make that single payment.

192.    Rather than instruct Enagon to cease manufacture or to withhold delivery and resell the Equipment as new Klaus and Martineau Firm again took no action and did not inform Duffy to secure independent counsel.

193.    Enagon delivered the Equipment to Schunks and M-61 which operated the Equipment causing damage and destruction which reduced the value to $400,000 thereby materially exposing Duffy to damages.

194.    SLC's Colorado Action ensued as described above with default judgments and the taking of all of the Schunks' and M61's property including the Equipment in July 2021.

195.    Martineau Firm and Klaus breached the relevant duty of care by failing to competently and adequately represent Plaintiff in providing competent advice as well as full and accurate information in accordance with relevant legal standards within the practice of law including without limitation as set out in paragraphs 196 through 205 inclusive below.

196.    The failure to advise and investigate the legitimacy of the $4,000,000 MSRP of

the Equipment.

197.    The failure to disclose that Schunks were known to have a very poor business reputation, were untrustworthy and did not have sufficient assets to fund the M61 transaction to make and finance the $4,000,000 Equipment purchase.

198.    That based upon his knowledge of the Schunks business operations they had no knowledge or expertise that would objectively justify putting them in charge of a new hemp processing operation with $4,000,000 on purchased Equipment.

199.    That Enagon was a relative new and small company and that a single sale of $2,000,000 let alone $4,000,000 was well outside of its norm and that it had relatively low trade credit not more than $100,000 per creditor.

200.    That a guaranty by Duffy would be called upon to pay the monthly loan payments due while he would have no control of operations of M61 because the operating agreements put Schunks in control with no money invested.

201.    On March 25, 2020 the attorneys were informed by Harris and SLC that they were going to be executing the Equipment transaction and funding the purchase, and that attorneys needed to prepare a sublease transaction for affiliate entities of Schunks that had the lease for the building where the Equipment would be placed. While attorneys did such sublease work it appears they took no steps to review the actual Equipment loan and guaranty transactions for the benefit of M61 and Duffy.

202.    Conducted no due diligence on Enagon or SLC as to the terms of the Equipment loan transaction nor the risks associated with a purchase that did not require immediate delivery of the Equipment to M61 to operate the business with knowledge that monthly  payments were still due to avoid defaults.

203.     The failure to disclose in writing, actual conflicts of interest they had in
simultaneously representing the interests of Duffy as minority membership interest holder in
M61 and guarantor while Schunks controlled M61 with no knowledge or experience in either the
acquisition of such Equipment or its operation and no financial wherewithal to meaningfully
guaranty the SLC loan - in other words Schunks did not care about the risk, they would throw
caution to the wind in hopes of hitting a grand slam while Duffy ended up with all the
unreasonable and unmitigated risk for the clearly unsuitable investment for the 84 year old Duffy
with no liquidity.

204.     The failure to secure a written retainer agreement to clearly and unambiguously
set forth their duties to Duffy, conflicts of interest and to recommend in writing the retention of
independent legal counsel.

205.     The failure to take immediate action against Enagon and Ebels, and to compel
Enagon continue to make the promised payments and recover any kickbacks paid.

206.     Plaintiff has now lost a combined $1,600,000 comprised of the $1,250,000
guaranty payment, loans of $250,000 and his two $50,000 payments, and related legal fees and
costs.

207.     Plaintiff alleges that his $1,600,000 is lost as a result of the failure of Martineau
Firm and Klaus to properly document and protect his interests before sending the M61 operating
and membership interest agreements to Washington for his signature and in their documenting
the subleases with SLC which led to the signing of the Equipment loan guaranty for the non-
existent Equipment that did not have a legitimate $4,000,000 MSRP. Further, to take no action
when the defaults were uncovered before asking Duffy to pay $100,000. Still further, Duffy has
also lost his Amerihemp investment as a result of Lee Schunk signing a guaranty against its

assets including inventory.

208.    As a direct and proximate result of Martineau Firm and Klaus' acts and omissions and Plaintiff's justifiable reliance thereon, Plaintiff has been damaged in an amount which will be proven at trial.

## COUNT X

### Breach of Fiduciary Duty

### Against Martineau Firm and Klaus

209.    Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

210.    Plaintiff alleges that Martineau Firm and Klaus were fiduciaries to Duffy in the organization of M61 and the issuance of the membership interests therein which required his guaranty of the SLC Equipment Finance agreement and the loans, as well as the negotiations on his behalf following the loan default all as described above.

211.    As Plaintiff's attorney, Martineau Firm and Klaus owed a fiduciary duty of care to Duffy and no one else. As such, Martineau Firm and Klaus were required to act in the "highest good faith" toward Duffy and were prohibited from obtaining any advantage over Duffy in any transaction arising out of their respective agency relationship.

212.    Further, Martineau Firm and Klaus were duty bound to make a full and complete disclosure of all material facts that might influence Duffy's decision to purchase the membership interests in M61, to sign the guaranty of the Equipment loan and to make the loans.

213.    Martineau Firm and Klaus failed to fulfill their legal and fiduciary duty to Duffy, as above alleged, and in particular their failure to disclose and protect and advise in each of the particulars described in paragraphs 214 through 220 inclusive.

214.    Enagon was a relatively small and new company with insufficient experience and expertise for the contemplated alleged $4,000,000 transaction let alone a $2,000,000 transaction.

215.    Schunks were small-time marginally competent farmers and equipment sales people without the knowledge, experience and expertise to negotiate, consummate, initiate and operate the transactions described herein.

216.    Klaus knew or should have known and cautioned Duffy that Schunks did not have the required knowledge, skill and expertise to operate the biomass processing operation that was described to Klaus.

217.    Klaus knew or should have known and advised Duffy that the contemplated transaction was beyond Schunks' capabilities.

218.    Schunks were well-known as poor if not bad businessmen, had a poor reputation in the Clare community, and were known to be untrustworthy.

219.    From the discussion he had with them, Klaus knew the Schunks were in over their heads and that he should have so informed Duffy.

220.    Klaus' principal problem was the conflict of interest he created by representing both Schunks and Duffy, compounded  by his failure to inform Duffy of such actual conflict in writing or at all.

221.    As an experienced business attorney, which Klaus held himself out to be, he had a duty to recognize, inform and caution Duffy regarding the significant adverse material risks associated with such a substantial highly leveraged loan transaction and guaranty. In fact Klaus knew that the 100% leveraged investment, with monthly loan payments to SLC exceeding $106,000, was extremely high risk and was unsuitable for an elderly, retired and passive out-of-state investor such as Duffy without liquidity. Yet, Klaus raised no red flags and failed to even

broach and discuss the risks with Duffy as described in paragraphs 222 through 224 inclusive.

222.    While formation documents for M61 were discussed at Klaus' meeting with Duffy, none were reviewed because they had not yet been prepared. There was no subsequent discussion because Klaus eventually emailed the documents to Duffy for signature, with no discussion, explanation, or advisement of potential adverse consequences or the conflicts, most of which were unwaivable.

223.    Klaus failed to inform and warn Duffy he would be sole surety for the Equipment loan because Schunks were fundamentally impecunious and their personal guarantees would be meaningless.

224.    The combination of Klaus' conflict of interest and his ineptness produced a perfect storm whereby Duffy was hit with a $2,000,000 demand on a liability pursuant to the Guaranty he in good reason would have never accepted had he been given competent counsel by a competent attorney.

225.    Martineau Firm and Klaus held a position of superiority over Duffy which they abused to their financial advantage.

226.    Martineau Firm and Klaus unconscionably breached the fiduciary duty of care they owed Duffy.

227.    These defendants' breach of that duty caused loss, injury and damage of not less than $2,000,000, plus the attorney's and other litigation related expense Duffy has incurred to defend himself from the result of these defendants' negligence and breach of the standard of care owed by an attorney to his client.

//

//

**COUNT XI**

**Equitable Indemnification**

**Against Enagon and Ebels**

228.     Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully set forth

herein.

229.     Plaintiff alleges that Enagon and Ebels negligently or intentionally misrepresented

the Equipment related $4,000,000 MSRP, the delivery date, performance and forecast operation

of the Equipment that was purchased on March 27, 2020 by M61, as described above. Enagon

was paid on March 31, 2020 the sum of $2,000,000.

230.     Duffy was not negligent or otherwise guilty of any fault in connection with the

negligent performance of and Enagon's representations regarding its contract performance in the

development and construction of the Equipment and its delivery dates pursuant to the M61

purchase and loan.

231.     Duffy was sued on his SLC loan Guaranty of the M61 Equipment financing in the

Colorado Action for in excess of $2,200,000 plus attorneys fees and costs.

232.     Duffy has been forced to settle with SLC on his Guaranty in SLC's Colorado

Action for $1,250,000 rather than risk a judgment in excess of $2,200,000.

233.     Duffy is now entitled to indemnity from Enagon and Ebels, and each of them, for

the sum of $1,250,000 plus his attorneys fees and costs as a result of Duffy being sued on his

Guaranty because of the conduct of Enagon and Ebels and each of them, which conduct was the

proximate and actual cause and reason for Duffy's settlement in the Colorado Action.

234.     By the filing of this Complaint and service on Enagon and Ebels, Duffy hereby

notifies said defendants of his tender of indemnity regarding the payment to settle the SLC

Colorado Action.

235.     It will be inequitable, and Enagon and Ebels will be unjustly enriched at Duffy's expense if said defendants are not held to account for the loss, injury and damage Duffy suffered from having to settle the Colorado Action.

<strong>JURY DEMAND</strong>

236.     Plaintiff demands a trial by jury on all claims so triable.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff prays for relief against all Defendants as follows:

1.     Judgment, jointly and severally against the Defendants, in an amount to be proven at trial, as a result of the Defendants' violations of the Washington State Securities Act, Securities and Exchange Act of 1934, Washington Consumer Protection Act, and common law claims for Negligent Misrepresentation, Intentional Misrepresentation (Inducement Fraud), Promissory Fraud, Legal Malpractice, Breach of Fiduciary Duty and Equitable Indemnification;

2.     An award of treble damages under the Washington Consumer Protection Act up to $25,000;

3.     An award to Plaintiff for his costs, interest, and attorneys' fees to the full extent allowed by law, including RCW 21.20.430 and RCW 19.86.090;

4.     For Equitable Indemnification;

5.     For compensatory damages according to proof;

6.     For special damages according to proof;

7.     For exemplary and punitive damages according to proof;

8.     For restitution and disgorgement; and

//

9.      Such other and further relief as the Court may deem just, proper and equitable.

DATED: February 10, 2022

_____

Attorneys for Plaintiff
Tim James O'Keefe (Bar No. CA290175)

BUSINESS ADDRESS AND TELEPHONE:
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, California 92801
(714) 520-5544
tokeefe@catanzarite.com